Peck *against* the Trustees of Randall, *an absent debtor.*

THIS was an action on the case. The declaration contained eight counts—1. For services, work, labour, care and diligence as master of two certain vessels, &c.— 2. *Quantum meruit* thereon—3. For work and labour, care and diligence in recapturing a certain schooner or vessel called the *Romp*—4. *Quantum meruit* thereon—5. For work and labour generally—6. *Quantum meruit*—7. For money paid, laid out and expended—and 8. For money had and received to the use of the plaintiff. The defendants pleaded *non assumpsit*, and *non assumpsit infra sex annos.* to which there was a replication and issue.

The cause was tried at the *New-York Sittings*, before Mr. Justice *Livingston*, on the 8th *December*, 1804, when the jury found a verdict for the plaintiff for $1122 damages, subject to the opinion of the court, on the following case:

*Paul Richard Randall* was owner of the schooner *Pomona*, of which the plaintiff was master. The vessel sailed from *New-York* in the month of *May*, 1796, for *Cape-Francois*, in the island of *St. Domingo*, having on board a cargo consisting chiefly of flour, belonging to *Randall*, and twenty barrels of flour, the private adventure of the plaintiff. The cargo, as well as the adventure of the plaintiff, were sold at *Cape-Francois*, and *Randall* received payment for the whole in bills of exchange on the *French* government. *Randall*, with the plaintiff, returned to *New-York* in the *Pomona* the 18th *August*, 1796, and there fitted out another vessel called the *Romp*, to which the plaintiff was appointed master, and sailed from *New-York* for *St. Domingo* about the 18th *September*, 1796, with *Randall*, the owner of the vessel and cargo, on board. The *Romp* arrived at *Cape-Francois* in *December*, at which place the greater part of her cargo was sold. From *Cape-Francois*, *Randall* and the plaintiff proceeded in the *Romp* to *Jacmel*, and on her pas-

Under the act *for giving relief against absent and absconding debtors*, the creditor cannot maintain a suit at law for his debt, against the *trustees* appointed pursuant to the act, before the demand has been proved or adjusted, and the dividend declared. The proper remedy is by petition to the equity power of the court, under which the proceedings are instituted, who will either compel the trustees to do their duty, or advise them in cases of doubt or difficulty.

The trustees under this act may plead the statute of limitations in the same manner as the debtor himself could have done. When the statute of limitations begins to run, it continues, notwithstanding any subsequent disability.

No salvage is due for the rescue or recapture by a neutral from a friendly power.

sage to that place, she was captured by a *British* ship of war, and ordered to *Jamaica.* On her passage towards that island, she was recaptured by the plaintiff and *Randall,* and carried into *Aux-Cayes.* A boy and a negro were on board, and the former assisted in the recapture, which was effected against a much superior force. The *Romp,* afterwards, in attempting to go from *Aux-Cayes* to another port in the same island, was captured by another *British* ship of war, and sent to *Jamaica,* with *Randall* and the master, who were kept in confinement. After being detained as prisoners for some time, they were released, and *Randall,* afterwards, went to *France,* where he has ever since resided. The plaintiff, at the particular request of *Randall,* staid at *Jamaica* for the purpose of procuring the release of the vessel and cargo, and returned to the *United States.*

*Randall,* in a letter dated at *Kingston,* the 24th *December,* 1796, speaks of the plaintiff as remaining at *Jamaica* at his solicitation, and as having acted for the interest of the owners, and as being entitled to a " most generous consideration."

An attachment under the act of this state, *for giving relief against absconding and absent debtors,* was issued against *Randall* in *November* 1800, and the present suit was commenced against the assignees on the first day of *January* 1803.

The judge on the trial was of opinion, that a part of the plaintiff's demand was barred by the statute of limitations, and doubted whether *salvage* could be recovered in this form of action. He thought also, that interest ought not to be computed on so stale a demand. The jury allowed $500 for *salvage,* being one twelfth of the net value of the property re-captured, but allowed no interest.

The following questions were raised for the consideration of the court :

1. Whether the defendants be liable to be sued in this action ?

2. If they be liable, whether the statute of limitations be a bar to that part of the plaintiff's demand which accrued prior to six years before the commencement of the action ?

3. Whether the plaintiff is entitled to salvage; if so, whether he can recover it in this form of action?

It was agreed, that if the opinion of the court should be against the plaintiff on the first question, that the verdict should be set aside, and a nonsuit entered; but if the court should decide in his favour on that point, and against him on the others, the verdict was to be adjusted accordingly. Interest was to be added, in case the plaintiff should be considered as entitled to it.

*T. L. Ogden* for the plaintiff.   1. Are the assignees of the debtor liable to be prosecuted in this action?  By the act* the assignees are declared trustees for all the creditors. From the nature of their trust, and according to the express directions of the statute, they are bound to pay to the creditors their respective dividends out of the effects of the debtor in their hands.    That it was the intent of the act that they should be liable, is obvious from the various provisions which it contains. · The trustees are empowered to settle all matters and accounts between the debtor, and his debtors or creditors, and to take examinations on oath for that purpose.†    In case of any controversy about such demands, they are authorised to submit them to the decision of referees.‡    After the estate of the debtor is converted into money, they are required to call a general meeting of the creditors, at which all accounts are to be fairly adjusted, and the trustees are to proceed to make a distribution among the creditors according to their respective demands.§    If any creditor neglect to give notice of his demand, or refuse to adjust it, he is precluded from a dividend, unless he comply before a second dividend is made.‖

* Rev. Laws,
Vol. 1. p. 236.
Sect. 8.

† Sect. 15.

‡ Sect. 16.

§ Sect. 17.

‖ Sect. 19.

It is evident from the whole tenor of the act, that it confers on the creditor who complies with its requisitions, a right to receive, while it imposes a duty on the trustees to pay him his dividend.    In the present case, the plaintiff has done every thing required of him by the act; and it is not pretended that the defendants have not sufficient funds, nor is any excuse offered for their refusal to pay his demand. The trustees are under a legal as well as a moral obligation

NEW-YORK,
May, 1806.

Peck
v.
Randall.

to pay, either of which is a sufficient ground to render them liable in an action of assumpsit.

The present act differs in many respects from the bankrupt laws. Assignees there are merely ministerial, and are only authorised to pay such debts as are proved before the commissioners. In the case of *Brown* v. *Bullen*, *Douglas* 407, it was held that assumpsit would lie against the assignees to recover a creditor's share of the dividend.

2. The statute of limitations takes away the remedy only ; the debt still remains due in *foro conscientiæ*. If the remedy were gone, the direction of the act to the trustees to pay debts would restore it. A debt barred by the statute of limitations, will support a commission of bankruptcy in *England* ; and no third person can take advantage of the limitation.*

* *Fowler* v.
*Brown Esp.* N.
P. 563. Cook's
B. L. 1. p. 11.
Blk. Rep. 2. p.
703.
*Quantock* v.
*England.*
S. C. *Burrows*
2628.
*Swaine* v. *Wal-linger.*
1 *Strange* 746.
† The case of
*Hassencleaver*
decided in this
court, was
cited ; but from
information of
counsel, it went
no farther than
to decide that
the trustees
were not bound
to plead the sta-
tute of limita-
tions.

§ Rob. Adm.
Rep. Vol. 1. p.
277. The Two
Friends.

The statute could not run in favour of *Randall* after the attachment issued.† The trustees were appointed in 1800, and they must have received the money of the debtor to the use of the plaintiff, subsequent to that period. This is the proper test as to the lapse of time ; the right of action did not accrue against the defendants until they had funds in their hands. From the year 1796 to that period, the statute clearly could not operate ; and from the time when the trustees became liable to pay, to the commencement of the present suit, six years had not elapsed.

3. It may be objected to the plaintiff's claim for *salvage*, that this was not a meritorious service, as it was a rescue from a friendly nation. The general conduct of the British cruisers, at that time, towards American vessels, was such, as to render recaptures beneficial to the owners, and meritorious in the recaptors. But as the owner was on board, and approved of the rescue, it is not for him to make this objection.§ If the recapture was unlawful, the risk was so much the greater, and enhances the claim of the plaintiff to his reward for a dangerous service performed at *Randall's* request. Again, it may be said, that the rescue was a part of the ordinary duty of a master, and does not entitle him to this extraordinary compensation ; but the master's duty terminated with the capture ; he was not bound to attempt the res-

cue.† The owner, as he directed and approved the service, is estopped from saying it was not lawful nor meritorious.‡ Besides, in his letter, he acknowledges that the plaintiff is entitled to a liberal compensation.

As to the form of action : A salvor has a *lien* on goods saved, and may retain them until he has received a reasonable compensation, and may maintain *trover* for them.§ If his *lien* is gone, he may have an action against the owner.—— The remedy is both *in rem et personam.* In the case of *Newman* v. *Walters,* 3 *Bos. & Pull.* 612, which was an action of *assumpsit,* it was decided, that a passenger who had saved a ship deserted by the master, was entitled to receive salvage in an action against the owner. The demand in the present case is not more uncertain than such as are usually made for a compensation for work and labour, the amount of which in actions of *assumpsit,* on a *quantum meruit,* depend on similar considerations as to the labour, risk, or value of the service performed. The interest is undoubtedly a proper charge on all the items of the account, except, perhaps, that of salvage.

*Harison* for the defendants. It is a general principle, that trustees can never be made personally responsible, except for their own individual acts. If trustees take possession of the goods, or sell and convert them into money, they are liable in respect to the goods or money so received. They can never be sued on the original contract of the person whose property is thus put into their hands. It is for their own contracts only that they can be made answerable. In the present case, no debt has ever been proved or established by the plaintiff, nor has any dividend been declared, which could entitle him to sue for his share of the fund. The trustees, it is true, are empowered to settle accounts, and do certain acts, but they are not obliged to perform them. They have decided upon this demand. And if the plaintiff wants a remedy, he should apply to the court of chancery, which is the proper tribunal to take cognizance of his claim, and can award a feigned issue to try the validity and amount of the demand. No precedent can

NEW-YORK,
May, 1806.

Peck
v.
Randall.

† Emerigon.
Tom. 1. p. 506.
‡ Rob. 1. 278.
§ 1. Ld. Raym.
393.
*Hartford* v.
*Jones.*
Abbot 322.

be found of an action against trustees on the original con-
tract. A court of chancery is the proper forum as to all
questions relating to trusts.

If the present form of action can be sustained, the trus-
tees would be made liable, out of their own estates, to the
full amount of the plaintiff's debt. The case cited from
*Douglas* is not applicable to the present; there the plaintiff
had proved his debt, and a dividend had been declared. In-
deed, it seems to be agreed, on all hands, that no action can
be maintained until a dividend is declared. The trustees
cannot be made liable for more than they have actually re-
ceived. In an action for money had and received, the whole
circumstances of the case may be fully investigated, and the
plaintiff can recover no more than his share, or what may
be considered as received *to his use.*

2. Some of the items, as the claim of salvage, are within
six years ; but the verdict is given for the whole amount.—
To save the whole of this claim from the operation of the
statute, it should appear to be an account-current between
merchant and merchant, where there are mutual items of
account; but here all the items are on one side, and the
statute runs against all of them except the charge of salvage.
The statute begins to operate as soon as the party is within
the jurisdiction of the state, and if he afterwards absent
himself, that cannot be urged in favour of the plaintiff; it
is his own fault if he do not commence his suit the first op-
portunity. After their return from the first voyage, both
parties were within the state, and all demands prior to the
second voyage are clearly barred. The creation of a trust
in the defendants cannot defeat the operation of the statute.
Where the statute once begins to operate, it runs over all
intermediate acts, and the bankruptcy of the defendant does
not prevent its effect. (1 *Strange* 556. *Gray* v. *Mendez.*
1 *Wilson* 134. *Smith* v. *Hill.* 4 *Term.* 306. *Durour* v.
*Jones,* *Buller N. P.* 159. 4 *Bac. ab.* 479. *in note. Gwillim's
Edition.*) If bankruptcy does not hinder the operation of
the statute, a *fortiori*, it cannot be defeated by a trust like
the present. The case of *Hassencleaver,* formerly decided

in this court, went no farther than to say that the assignees were not compelled to plead the statute, and is a case more in favour of the defendants, than against them.

3. Another item of the account is for salvage. As the right of search is admitted, it follows, as a necessary consequence, that it is the duty of the neutral to submit to the examination. This is, unquestionably, the safest rule. Individuals should not be permitted to take upon themselves the vindication of national rights, but leave them to the protection of the government. The rescue, or attempt to rescue, is an illegal act which renders the property liable to confiscation ; instead of being beneficial, it is injurious to the owner, by exposing his goods to the risque of condemnation. To entitle the party to salvage, the service should be both lawful and meritorious.

From the facts in this case, it does not appear that the property ever arrived in safety. If after the rescue, the goods never arrive, there can be no claim to salvage, for it would be carrying the doctrine a great way, to say, that a party was intitled to salvage for an unsuccessful attempt.— The language of the parties in this case, is : if my property be saved by you, and come to my hands, I will give you a portion of it as a compensation for your services. Salvage does not rest on the common implied contract of a *quantum meruit* for labour performed. It is an extraordinary recompence, founded on the fact that the goods have been saved, and brought again into the hands of the owner.

*D. B. Ogden* in reply. The language of the act is imperative as it regards the trustees, and they are bound to perform the duties prescribed ; and having, in the present case, failed to do so, the plaintiff is entitled to his action against them. No objection was made at the trial, that the defendant had no funds, out of which the plaintiff could be paid. If the trustees did not intend to be answerable on the original contract, they shou.d have pleaded specially, that they had paid over all the monies of the debtor which had come to their hands, as in the case of executors or administrators.

NEW-YORK,
May, 1806.

Peck
v.
Randall.

* 1 Blk. Rep.
354. *Fenton* v.
*Emblers.*

† 4 *Bac. Ab.*
470. *Gwillim's
Edition.*

‡ *Trueman* v.
*Fenton. Cowper*
548.

The trustees are bound to pay all just demands. If a man devises that all his *just* debts shall be paid, this includes those barred by the statute as well as other debts. Part of the present demand arose in *August* 1800. The attachment issued in *November* 1800, at which time the statute had not begun to run. According to the act, no trustees could be appointed until after the expiration of one year. The principle of limitation is founded on the idea of *laches* in the plaintiff ;* but here, no *laches* can be imputed to him, for there was no person against whom he could bring his action. If there be no executor or administrator against whom the party can bring his action, he shall not be prejudiced by the statute.† If, therefore, one year be deducted, there will remain but five years and five months, from the time the right of action first accrued to the commencement of the present suit. Part of the plaintiff's demand is for services performed from 1796 to 1797, and though some be within the statute, yet the service being *continued*, the end of the period is the point at which the time ought to begin. If, as in the case of running accounts between merchants, one item of credit be such an acknowledgement of an unsettled account, as to take the whole out of the statute ; for the same reason the continuance of the plaintiff in the service of *Randall* from day to day, should have a similar effect. Again, the flour was sold on a credit for bills on France, at what sight does not appear, but, according to the usual course of business, they could not be paid under four or five months from their date ; and allowing this time in the computation, the demand will be saved. It appears also, that *Randall* has not been in this state since *August* 1796, and has received the proceeds since that time. He could not, therefore, be sued, since the plaintiff's right of action accrued.

A debt though barred by the statute, remains binding on the conscience of the debtor,‡ and it is to be left to his conscience whether he will avail himself of the statute or not.—It may, perhaps, be worthy of consideration, whether the privilege of making such a plea is not to be confined to the

party himself or his immediate representatives, and not to be extended to third persons appointed by law, over whose consciences the plaintiff can have no influence.§

3. *Salvage*, strictly speaking, is a compensation allowed by law to strangers for saving the property of another, not under their care. It is intended as an inducement to engage persons in the execution of a service, which they are under no obligation to perform. It is not pretended that the master and seamen are entitled to salvage for preventing the loss of either vessel or cargo, confided to their care ; and if the rescue in this case could be shown to be a part of their duty in relation to the property, there would be an end of the question. The policy of the law has provided a sufficient inducement for their exertions, in making their wages depend on the preservation of the ship and cargo, or in other words, the earning of freight. But it was the duty of the master and crew of the *Romp* to submit to the search and detention, since resistance would have been unlawful. After the capture, and while the property was in possession of the *British*, there was an end of their ordinary duties. As rescuers or recaptors, they may be considered as strangers performing an extraordinary service, at great risque, and for the benefit of the owner. On the arrival of the vessel at *Aux-Cayes*, she came into the possession of the owner, and the plaintiff's right to salvage was perfect, and could not be defeated by any subsequent act of *Randall* in relation to the property.

KENT, C. J. The first question is whether the defendants are liable to be prosecuted in this action ?

The court in which the proceedings under the absconding debtor act are pending, has an equitable jurisdiction over all claims between the trustees on the one hand and the debtor and creditors on the other. This jurisdiction is given by the 29th section of the act *(Laws of N. Y. vol.* 1, 244*)* which makes " the trustees subject to such order for the more effectual execution of the act, as shall be made in the court of which the person appointing them is judge." It was in pursuance of this power that the court ruled in *the case of*

<div style="margin">

NEW-YORK, May, 1806.

Peck
v.
Randall.

§ This idea seems to be countenanced by the expressions of Lord Mansfield in the case of *Quantock* v. *England,* 5 *Burrows* 2628. & 2 Blacks.Rep. 702. See also the reasoning of the judges in the case of *Bickridge* v. *Bolman,* 1 Term 405.

</div>

NEW-YORK,
May, 1806.

Peck
v.
Randall.

*Cascaden (October Term* 1800*)* that trustees were liable to account on the application of either debtor or creditor, and in the case of *the trustees of Cowenhoven (January Term* 1803*)* that they were entitled to apply for advice as to making dividends, on due notice being given to the creditor whose account was in question. The trustees very much resemble commissioners under the *English* bankrupt laws, since they are to liquidate all demands, and declare, as well as pay dividends ; and the practice in *England* is for the creditor to apply to the court of chancery for assistance in obtaining his dividend.—1 *Atk.* 90. The only instance, perhaps, in which a suit at law has been sustained even against the assignees of a bankrupt, is where the creditor's debt has been proved and a dividend declared by the commissioners, and a refusal on the part of the assignees to pay it. In that case the dividend has been considered as so much money in the hands of the assignees for the use of the creditor, and an action at law was sustained for it. *Brown* v. *Buller, Doug.* 407. But the present is an action against the trustees before the demand has been adjusted, and without proof of any dividend having been declared. I am induced to think that the plaintiff has mistaken his remedy, and that he ought to have applied by petition to the equitable powers of this court to coerce the defendant into an adjustment of his demand and to account. The special provisions in the statute are inconsistent with a right to sustain the present action, and it would derange the whole order and system of those provisions.— Demands not yet due are proveable and payable upon a rebate of interest, and debts not proved at the two meetings appointed by the trustees for that purpose are barred from the benefit of a dividend. Other difficulties may be suggested which would embarrass a general right in the creditor to proceed against the trustees by the common law process, all of which may be avoided by confining the creditor to the remedy prescribed by the act.

But the next question is whether we ought not now to proceed to give our advice and direction upon the case as before us ? We have the merits of the plaintiff's claim, and we have a verdict ascertaining the matters of fact, and the

defendants have at this very term applied to us by petition for direction in respect to their trust. I see no difficulty in taking up the case and making such order as the nature of it shall require.

A point then that arises is, how far the statute of limitations is a bar to the plaintiff's demand? The defendants have thought proper to insist upon it, and I see no reason why they may not avail themselves of it equally as if their principal was himself the defendant.—In the case of the *Assignees of England* v. *England*, 5 *Burr.* 2628,* it was admitted that the bankrupt might object that the petitioning creditor's debt was above six years old, though after the commission granted, a third person could not raise such an objection to defeat the commission. The trustees succeed to the rights of their principal and consequently to his means of defence. The demands of the plaintiff arising on the second voyage are clearly not affected by this plea, as the debtor has not been within this state since those demands accrued. The right of action for demands existing prior to *August* 1796, was placed under the operation of the statute of limitations, as the parties were then within this state. It does not appear when *Randall* received payment from the *French* government of the bills of exchange drawn upon it in the summer of 1796, for the 20 barrels of flour belonging to the plaintiff. As the plaintiff and *Randall* were then together, and acting together in a joint concern, it may be presumed, that the flour was sold and the bills of exchange received in payment by *Randall* with the knowledge and consent of the plaintiff, and unless those bills were paid before the *August* following, there is no colour for the plea on any ground, because at that time no money had been received to the use of the plaintiff. This money may, or may not have been received, and I think it was incumbent on the trustees to have shown affirmatively, that the money was received before that time and in the hands of their principal. They set up the statute, and they must shew that it applies. The plaintiff calls upon them to account for the proceeds of these 20 barrels of flour, and to protect themselves under

* S. C. 2 *Black.* 702.

NEW-YORK,
May, 1806.

Peck
v.
Randall.

the statute, they must show that *Randall* had the money in *August* 1796, when he was last at *New-York*. They have not done this, and the facts in the case are not such as to require us to presume that the money had been received, as early as at that period. The services of the plaintiff upon the first voyage stand upon a different ground. They had been rendered before *August* 1796, and for any thing that appears to the contrary, the plaintiff was then entitled to payment for them. The general rule is that when the statute of limitations once begins to run, it continues to run notwithstanding any subsequent disability. The exhibition of the plaintiff's claim to the trustees in *December* 1802, may be considered as equivalent to the commencement of a suit, and so it ought to be since an action at law will not lie against the trustees. The six years had however expired in *August* 1802, unless something had previously occurred to arrest the progress of the statute, and I know of nothing that could do it. The plaintiff was not prevented by any disability from suing *Randall* in *August* 1796, and the statute consequently then commenced to run, and the absence of the debtor afterwards would not impede it. The plaintiff was always at liberty to sue out process against the debtor and continue it down on the roll. According to the established exposition of the statute of limitation, I am of opinion that the demand of the plaintiff as to his services for the first voyage was barred by the statute when he exhibited his claim in *December* 1802.

Another question in the case is respecting the demand for salvage.

This is a grave question considering the circumstances under which it is presented. Here was a rescue by force, not from an enemy, but from a friendly power.

*Randall* the owner of the vessel and cargo took the law into his own hands, and violated his neutral duty, for he was bound to have submitted to a judicial inquiry. He would have been entitled to costs and damages if the seizure and detention had been unjust. Whether they were so or not, I am not now to inquire. In judgment of law, such a rescue

was not beneficial but injurious to the property, as it exposed it to condemnation from the very act of rescue. The general rule of maritime law is, that salvage is not due on recapture of neutral property, and the rule is founded on the supposition that no service is rendered, and on the presumption that a neutral carried in by a belligerent for examination, being in no danger, receives no benefit from recapture. (1 *Cranch* 36.*) This rule was relaxed by the *British* court of admiralty during the last war in respect to neutrals captured by *French* vessels, on the ground that a signal benefit was conferred on the neutral by rescuing him from the irregular and rapacious decrees of the *French* tribunals. In the present war, however, the exception seems to be abandoned and the general rule of the law of nations acquiesced in and enforced. *(The Carlotta, 5 Rob. 54.)* Whatever reason there might have been for the exception in the instance referred to, there existed no sufficient reason in the autumn of 1796, in respect to a *British* capture to withhold the application of the general rule. If therefore *Randall's* vessel and cargo had been lawfully recaptured from the *British*, he would have been entitled to restitution without payment of salvage, but being unlawful and tortious, there is not, under any circumstances, a just ground or claim for salvage. The illegality of the rescue will not be questioned, for that would be to deny the right of visitation and search, and to justify resistance to it: it would be to deny the right of carrying into port for inquiry and examination, and to justify resistance to that act also. Right and duty are reciprocal in this case. The right to search and the right to carry in, necessarily imply the correspondent duty to submit. If *Randall* was justifiable in his rescue, then it would have been lawful for any other *American* vessel that should have met him, to have rendered him assistance, a proposition leading directly to public hostilities, and too untenable to admit of a serious consideration. If the rescue was unlawful, no claim for salvage can be deduced from it, and for this we have the authority of the supreme court of the *United States*, in the case of *Talbot* v. *Seeman*, *(1 Cranch, 28.)*

NEW-YORK,
May, 1806.

Peck
v.
Randall.

* *Talbot*
v.
*Seeman.*

NEW-YORK,
May, 1806.

Peck
v.
Randall.

" To support the claim for salvage," says the chief justice, in giving the opinion of the court, "the taking must be lawful, for no claim can be maintained in a court of justice, founded on an act in itself tortious. On a recapture, made by a neutral power, no claim for salvage can arise, because the act of retaking is a hostile act, not justified by the situation of the nation to which the vessel making the recapture belongs, in relation to that from the possession of which such recaptured vessel was taken. No right can accrue from an act in itself unlawful."

The plaintiff was a *particeps criminis* with *Randall* in the rescue, and the law will not raise an assumption in his favour. There is nothing in *Randall's* letter annexed to the case that contains any recognition of his services in respect to the rescue ; and if it had contained any promise of compensation for that service, I should be inclined against its validity as being founded on an illegal consideration.

I am accordingly of opinion, that the plaintiff's claim for salvage and for his services as master on the first voyage ought not to be allowed, and that his claim for the proceeds of the 20 barrels of flour, together with interest on the same from the receipt of the money by *Randall*, and his claim for services on the second voyage, but without interest on such claim as the same was an unliquidated demand, ought to be admitted. Each party ought to bear his own costs arising on the suit, as it was a case of mutual mistake ; by the plaintiff in commencing the suit, and by the defendants in suffering it to proceed under a plea to the merits.

Having thus settled the questions between the parties, if any difficulty should arise as to the liquidation and payment of the sum due to the plaintiff, further application must be made to the court.

THOMPSON, J. and SPENCER, J. concurred.

LIVINGSTON, J. I concur in the opinion just delivered, except so far as it relates to salvage.

The owner being on board, and the recapture effected with his concurrence and at his request, should preclude all inquiry as to its legality, or whether any benefit were con-

ferred on *Randall* by it.   But it is supposed that the mas-
ter's duty being to submit to be carried in,  he was guilty of
a tortious act in taking .the vessel and cargo out of the
hands of the captors.   The case of *Talbot & Seeman**  in
the supreme court of the *United States*, has been cited as in
point against the present demand;  but with me this decision
is a strong and conclusive authority the other way.   Though
*Hamburgh* and *France* were at peace, and though the *Ame-
lia* was recaptured without any request of its owners, cap-
tain *Talbot* was allowed salvage, because of the danger the
neutral vessel run of an unjust condemnation.   Will any one
undertake to say that the *Romp* was in no danger, or have we
already forgot the many violent condemnations of neutrals
which took place in the *British*, as well as the *French West-
Indies*, during the last war between *England* and *France ;*
the consequent high premiums for insurance of neutral
property; the reiterated complaints of our merchants, and
the remonstrances of our government.   Were a belligerent
in its conduct towards neutrals, always to respect the law of
nations, there would be no great danger from his being car-
ried into port ; but when their property is subject to confis-
cation on the most frivolous pretences, and while admiralty
courts are governed by the most arbitrary instructions, or
*arrets* of their sovereign it is a compliment which I am not
willing under such circumstances to pay to any nation, to
say that a liberation with costs and damages, would cer-
tainly have taken place on the same ground.   Sir *William
Scott* allows salvage on the recapture of neutral property
from the *French*, and the asperity with which the learned
judge remarks on the unjust decrees of the governing pow-
ers of *France*, and the rapacious conduct of its maritime
tribunals, might without any violent outrage on truth, have
been applied to the vice-admiralties of his own country, and
to some of· the orders under which he himself has some-
times been compelled to act.   But it is enough for me, that
*Randall* who was the best judge, thought there was danger.
If the master of the *Hamburgher* had requested captain
*Talbot* to retake him, I do not believe the supreme court

would have heard an argument on the subject; nor were *Randall's* fears imaginary, for we afterwards find this very vessel again in the hands of the *British*, and himself complaining very bitterly in a letter to a friend, of the great delays and the little prospect he had of being acquitted. " At present," says he, " I have no sanguine hopes of a decree in our " favour, notwithstanding a new judge is appointed; the for- " mer, one sought every excuse for a condemnation, and " was supposed to be under the influence of the agent of the " navy." He concludes this letter with observing, that he thinks " *Peck* entitled to his most generous consideration;" yet we do not hesitate to say, as if we were better acquainted with his concerns, that *Peck* has rendered him no service at all, but that he deserves to be punished as a wrongdoer in rescuing a vessel which, if the truth were known, ought perhaps never to have been taken out of its course. I must confess, I feel no inclination to discourage these enterprises on the part of our mariners, which are generally considered as meritorious, and are often rewarded by underwriters. " When the lawless and irregular practices" of belligerents towards neutrals, which Sir *William Scott* speaks of, shall cease, it will be time enough to deny salvage for the liberation of neutral property. Upon the whole I have no doubt, that whatever might have been the case, if the recapture had been made in *Randall's* absence, we ought not now to permit him to say that he has not been benefited by it. It was enough he thought there was danger, and that the captain might have been injured by the attempt. The right to salvage became perfect in my opinion, on the safe arrival of the *Romp* at *Aux-Cayes*, though she was afterwards captured in attempting to go to another port.

TOMPKINS, J. I concur in the opinion delivered by the chief justice, excepting as to the costs. As the plaintiff has resorted to an action, which cannot be maintained upon legal principles, it appears to me that payment of costs by him is a natural consequence; otherwise, I am at a loss to know by what form of judgment upon the record, the defendants can avail themselves of our decision. The plea of

the general issue ought not to prejudice them here, because, they might have intended to avail themselves of the insufficiency of the declaration, by motion in arrest of judgment, or upon writ of error. I am not disposed to subject the trustees to personal responsibility for costs, where a creditor has thought proper to harrass them with a suit which cannot be maintained; on the other hand to award costs payable out of the estate of the absent debtor, is an infringement of the rights of the third persons. The dividends of other creditors, who may have proved their debts in the manner prescribed by the statute, will be diminished by paying to this plaintiff out of the fund, a bill of costs accrued in consequence of his misconception of his remedy. I am therefore of opinion, the defendants ought to recover costs against the plaintiffs.